AO 91 (Rev. 11/11) Criminal Complaint

**FILED**
6/15/2022
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Jasmina Vajzovic (312) 469-6233

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

ANTHONY PEREZ-FLORES

CASE NUMBER: 22 CR 310

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

From on or about February 18, 2022 and continuing until at least on or about May 13, 2022 at Chicago, in the Northern District of Illinois, Eastern Division, the defendant, Anthony PEREZ-FLORES, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(a)(1) | willfully engaged in the business of dealing in firearms without a license |

### Count Two

On or about April 1, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant, Anthony PEREZ-FLORES, violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, namely, a Glock Model 19X pistol bearing serial number BUYZ443 and associated ammunition, which firearm had traveled in interstate commerce prior to defendant's possession of the firearm |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

THOMAS SHEEHAN
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>June 15, 2022</u>　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*Judge's signature*

City and state: <u>Chicago, Illinois</u>　　　　　　　　YOUNG B. KIM, U.S. Magistrate Judge
　　　　　　　　　　　　　　　　　　　　　　　　　　　*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, Thomas Sheehan, being duly sworn, state as follows:

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), and have been so employed for approximately 7 years. My current responsibilities include the investigation of federal firearms offenses, including unlawful possession of firearms or ammunition by convicted felons.

2.     This affidavit is made in support of:

   a.     a criminal complaint alleging that ANTHONY PEREZ-FLORES has committed the offenses of unlawful possession of a firearm by a felon and willfully engaging in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 922(g)(1) (the "Subject Offenses");

   b.     an application for a warrant to search the apartment unit located at 7754 West Belmont Avenue, Unit #2, Chicago, Illinois 60634, which is a premises used by ANTHONY PEREZ-FLORES to store firearms that he unlawfully possesses and distributes to others (as explained below), described further in Attachment A-1 (the "**Subject Premises**"), for evidence, instrumentalities, fruits, and contraband, described further in Attachment B-1, concerning the Subject Offenses; and

   c.     an application for a warrant to search the Apple iPhone cellular telephone used by ANTHONY PEREZ-FLORES, with phone number (872) 258-8875 and bearing IMSI 310260259940898, with service provided by T-Mobile, Inc., as described further in Attachment A-2 (the "**Subject Phone**"), for evidence, instrumentalities, and fruits described further in Attachment B-2, concerning the Subject Offenses.

3.     The statements in this affidavit are based on multiple sources, including but not limited to: my personal knowledge; my review of reports and documents related to this investigation; my review of video recordings related to this investigation; conversations with others who have knowledge of the events and circumstances described in this affidavit; my review of law enforcement databases; my training and experience and the training and experience of other agents with whom I work; and information provided to me by persons with knowledge regarding relevant facts.

4.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and securing warrants to search the **Subject Premises** and the **Subject Phone**, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe establish probable cause to believe that ANTHONY PEREZ-FLORES has committed and is committing the Subject Offenses. I have further set forth facts that I believe establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of the Subject Offenses are located at the **Subject Premises** and that evidence and instrumentalities of the Subject Offenses are located in the **Subject Phone**.

## PROBABLE CAUSE

5.     In summary, and as set forth in more detail below, between approximately February 18, 2022 and May 13, 2022, PEREZ-FLORES sold approximately thirteen firearms on ten different occasions to an ATF undercover

agent (the "UC"), including firearms commonly known as "ghost guns"[1] and a firearm equipped with a machinegun conversion device.[2]

6.     More specifically, and as set forth in more detail below, prior to and during each transaction, the UC communicated with PEREZ-FLORES using the **Subject Phone** to coordinate the transactions. Further, during each of the ten transactions, PEREZ-FLORES met with the UC in an alley behind the **Subject Premises**. During the transactions, PEREZ-FLORES came out of the building containing the **Subject Premises** with concealed firearms and exchanged those firearms for money with the UC. Following each meeting, law enforcement observed PEREZ-FLORES travel back into the building containing the **Subject Premises**.

## I.     FACTS SUPPORTING PROBABLE CAUSE THAT ANTHONY PEREZ-FLORES HAS COMMITTED THE SUBJECT OFFENSES

7.     As described in more detail below, on or about February 18, 2022, February 23, 2022, February 24, 2022,[3] April 1, 2022, April 4, 2022, April 13, 2022, April 14, 2022, April 25, 2022, May 4, 2022, and May 13, 2022, PEREZ-FLORES sold the UC approximately 13 firearms.

---

[1] Based on my training and experience, I know that guns that are assembled from gun kits without a serial number, making them undetectable and/or untraceable, are commonly referred to as "ghost guns."

[2] Based on my training and experience, I know that guns equipped with machinegun conversion devices, commonly referred to as "switches," allow users to fire multiple rounds with a single trigger pull.

[3] Additional details regarding the February 18, 2022, February 23, 2022, and February 24, 2022 transactions can be found in the government's affidavit in support of an application for a search warrant related to the cellular telephone number (872) 258-8875 (the **Subject Phone**), which is incorporated herein and can be provided to the Court upon request.

A. **April 1, 2022 Transaction of a Firearm With a Machinegun Conversion Device**

8.  On or about March 31, 2022, starting at approximately 12:57 p.m., the UC and PEREZ-FLORES, who was using the **Subject Phone**,[4] exchanged recorded texts messages and a phone call.[5] During these communications, the UC and PEREZ-FLORES arranged for the purchase of a firearm with a "switch,"[6] meaning a machinegun conversion device, for the following day at the **Subject Premises**.[7]

9.  On or about April 1, 2022, at approximately 3:31 p.m., law enforcement surveillance observed a black Chevrolet Impala park in front of the **Subject Premises**. The **Subject Premises** is the second-floor unit in a two-story multi-unit building located at 7754 W. Belmont Avenue in Chicago, Illinois. According to law

---

[4] Law enforcement identified PEREZ-FLORES as the user of this phone number because, as described throughout this affidavit, the UC communicated with the user of the **Subject Phone** to arrange several firearms transactions. During each of the transactions, PEREZ-FLORES arrived at the date and time arranged for the firearm transactions and proceeded to sell the UC the firearms. In addition, based on the UC's in-person interactions with PEREZ-FLORES, the UC became familiar with PEREZ-FLORES' voice and identified PEREZ-FLORES as the person who used the **Subject Phone** to speak with the UC before and after the controlled purchases.

[5] The calls and text messages the UC exchanged with PEREZ-FLORES were recorded.

[6] At various points in this affidavit, I will offer my understanding and interpretation of certain statements, including intercepted or recorded conversations, in bracketed comments or during the description of the conversation. My understanding and/or interpretation of these conversations is based upon the contents of the conversations, the context of both prior and subsequent conversations, information received from confidential sources and other law enforcement officials, my knowledge derived from this investigation, and my experience and familiarity with firearms trafficking. Except as noted, the summaries of conversations contained in this affidavit that occurred in relation to the controlled purchase of firearms represent a review of the audio and video recordings and do not represent finalized transcripts of the conversations and may not represent the entire conversation that occurred between the identified individuals.

[7] As detailed in the government's affidavit in support of an application for a search warrant related to the cellular telephone number (872) 258-8875 (the **Subject Phone**), each of the February transactions occurred behind the **Subject Premises**.

enforcement surveillance, there are entrances to the building on the south side, which is the side of the building that faces Belmont Avenue, and the north side, which is the back of the building towards the alley. There is a sidewalk on the east side of the building that allows an individual to walk from the front to the back of the building.

10.     At approximately 3:36 p.m., law enforcement surveillance observed an individual matching the description of PEREZ-FLORES exit the **Subject Premises** through the front of the building and enter the rear passenger side of the Chevrolet Impala. At approximately the same time, law enforcement surveillance observed a male later identified as Individual A, exit the front driver's seat of the Impala, retrieve what appeared to be a white garment from the trunk and return to the driver's seat of the Chevrolet Impala.

11.     At approximately 3:44 p.m., the UC, equipped with an audio/video recording device and driving the undercover vehicle, arrived in the alleyway behind the **Subject Premises**. The UC sent PEREZ-FLORES, who was using the **Subject Phone**, a text message, to let PEREZ-FLORES know the UC had arrived. PEREZ-FLORES, using the **Subject Phone**, responded with a text message acknowledging the UC had arrived.

12.     At approximately 3:46 p.m., law enforcement surveillance observed PEREZ-FLORES[8] walk from the Impala, which was parked in the front of the **Subject Premises**, to the undercover vehicle parked behind the **Subject Premises**

---

[8] Law enforcement identified PEREZ-FLORES by comparing a known photograph of PEREZ-FLORES to the individual who met with the UC on or about April 1, 2022.

and enter the front passenger seat of the undercover vehicle. According to law enforcement surveillance, PEREZ-FLORES traveled along the east side of the **Subject Premises** to reach the rear of the building.

13. According to the UC and the audio/video recording, once inside the vehicle, PEREZ-FLORES placed a firearm on the center console of the undercover vehicle. The firearm was equipped with a machinegun conversion device and extended magazine. The UC and PEREZ-FLORES then discussed the functionality of the machine gun conversion device.

14. During the transaction, the UC handed PEREZ-FLORES approximately $1,900 in prerecorded ATF funds in exchange for the firearm and ammunition.

15. At approximately 3:48 p.m., law enforcement surveillance observed PEREZ-FLORES exit the undercover vehicle, walk to the front of the **Subject Premises**, and then enter the rear passenger side of the Chevrolet Impala, which was still parked in front of the residence. Once PEREZ-FLORES was inside the vehicle, law enforcement surveillance observed PEREZ-FLORES pass what appeared to be United States currency to Individual A, who was seated in the front driver's seat.

16. Law enforcement later determined the firearm given to the UC by PEREZ-FLORES to be a Glock model 19X pistol bearing serial number BUYZ443 with an attached machinegun conversion device.

**B. April 4, 2022 Transaction of One Firearm**

17. On or about April 2, 2022, PEREZ-FLORES, who was using the **Subject Phone**, and the UC communicated through text messages and a phone call. During

these communications, PEREZ-FLORES, using the **Subject Phone**, initially agreed to meet the UC and sell the UC two firearms on April 4, 2022 for $1,050 each. Prior to the transaction, PEREZ-FLORES told the UC that he could only sell the UC one pistol for $1,050.

18.     On or about April 4, 2022, at approximately 1:15 p.m., the UC, who was equipped with an audio/video recording device, drove an undercover vehicle to the area of **Subject Premises** and parked behind the residence. A short time later, according to surveillance and the UC, PEREZ-FLORES entered the front passenger seat of the undercover vehicle. According to the UC and the audio/video recording, while inside the undercover vehicle, PEREZ-FLORES handed the UC a semi-automatic pistol and the UC handed PEREZ-FLORES $1,050 in pre-recorded ATF funds. According to law enforcement surveillance, at approximately 1:23 p.m., PEREZ-FLORES exited the undercover vehicle and walked into the front of the building containing the **Subject Premises.**

19.     Law enforcement later determined the firearm to be a HS Produkt Springfield Armory Model XD40 semi-automatic pistol, bearing serial number XD388405.

**C.     April 13, 2022 Transaction of Two Firearms**

20.     On or about April 12, 2022, PEREZ-FLORES, using the **Subject Phone**, communicated with the UC via text message and arranged a firearms transaction for the following day.

21.     On or about April 13, 2022, at approximately 2:04 p.m., the UC, who was equipped with an audio/video recording device, drove an undercover vehicle to

the area of the **Subject Premises** and parked in the rear of the residence. The UC then sent PEREZ-FLORES, who was using the **Subject Phone**, a text message, to let PEREZ-FLORES know the UC had arrived. PEREZ-FLORES responded with a text message acknowledging the UC had arrived.

22.     At approximately 2:09 p.m., law enforcement surveillance observed PEREZ-FLORES exit the front of the building containing the **Subject Premises** and walk to the rear of the building where the UC was parked. Law enforcement surveillance observed PEREZ-FLORES to be carrying what appeared to be a black pistol box. PEREZ-FLORES then entered the front passenger seat of the undercover vehicle. According to the UC and the audio/video recording, once inside the vehicle, PEREZ-FLORES handed the UC two pistols and the UC handed PEREZ-FLORES $2,250 of prerecorded funds for the pistols. According to the UC and the audio/video recording, during the transaction, the UC and PEREZ-FLORES discussed future firearms transactions. At approximately 2:15 p.m., law enforcement surveillance observed PEREZ-FLORES exit the undercover vehicle and walk back into the front of the building containing the **Subject Premises**.

23.     Law enforcement later determined the firearms to be a) a Taurus Model GX4 pistol bearing serial number 1GA15768 with a magazine and ammunition, and b) a Glock, Inc. Model 19 Gen4 pistol bearing serial number BKHZ515 with an extended magazine and ammunition.

### D.     April 14, 2022 Transaction of Two Firearms

24.     On or about April 13, 2022, the UC and PEREZ-FLORES, who was using the **Subject Phone**, communicated through recorded text messages and phone calls.

During these communications, the UC and PEREZ-FLORES arranged for the purchase of two firearms for $2,600, for the following day.

25. On or about April 14, 2022, at approximately 2:15 p.m., the UC, equipped with an audio/video recording device and driving the undercover vehicle, arrived in the alleyway behind the **Subject Premises**. At approximately 2:23 p.m., law enforcement surveillance and the UC observed PEREZ-FLORES enter the front passenger seat of the undercover vehicle with a plastic bag.

26. According to the UC and the audio/video recording, while inside the undercover vehicle, PEREZ-FLORES removed a black gun case from the plastic bag. PEREZ-FLORES then removed what appeared to be a MAC type firearm and magazine from the case and placed the firearm on the center console of the vehicle. According to the UC and the audio/video recording, the UC then asked, "you have to do anything for it to shoot the fucking burst?" Based on my training and experience, and the UC's training and experience, I understand "shoot the burst" to mean using a part known as a selector switch[9] to make the firearm shoot in a fully automatic manner. PEREZ-FLORES stated, "Nah he said it's a three round burst just like that." Based on my training and experience, and the UC's training and experience, I understand "three round burst" to mean that the firearm automatically fires three rounds for one trigger pull.

---

[9] Based on my training and experience, I know that a selector switch is a part on a firearm that allows the user of the firearm to switch the firearm from firing in a semiautomatic manner to a fully automatic manner, if the weapon is capable of shooting in a fully automatic manner.

27.    According to the UC and the audio/video recording, during the transaction, the UC and PEREZ-FLORES discussed the exact price for the MAC firearm and the UC attempted to negotiate a lower price for the MAC firearm. In response, PEREZ-FLORES stated the firearm and magazine were perfect. The UC pointed out that he/she did not know if the firearm "pops off," meaning that the firearm fires in a fully automatic manner like PEREZ-FLORES stated it does. According to the UC, PEREZ-FLORES then showed the UC text messages on an Apple iPhone between him and another individual about the MAC firearm. According to the UC, in the messages, the source assured PEREZ-FLORES that the firearm shot a three-round burst, meaning that the firearm fires three rounds for one trigger pull.

28.    According to the UC and the audio/video recording, during the transaction, PEREZ-FLORES also pulled another firearm with an extended magazine from his waistband. PEREZ-FLORES handed the firearm to the UC. According to the UC and the audio/video recording, PEREZ-FLORES gave the UC a second magazine for the firearm and asked, "You want the regular clip [magazine] or can I keep it." The UC asked if he could have the "batteries," meaning ammunition, contained in the magazine. PEREZ-FLORES agreed. The UC told PEREZ-FLORES he could keep the empty magazine. According to the UC and the audio/video recording, PEREZ-FLORES placed the ammunition in the cup holder located on the center console of the undercover vehicle.

29.    According to the UC and the audio/video recording, PEREZ-FLORES

asked the UC if the UC was still trying to get the "AR," meaning an assault-type rifle. The UC responded that he/she was, but would be going out of town for a week, and asked if PEREZ-FLORES could hold the rifle for the UC. According to the UC and the audio/video recording, PEREZ-FLORES then asked if the UC wanted anything sooner and offered a "Sig" [Sig Sauer brand] firearm for a "stack," meaning $1,000. PEREZ-FLORES showed the UC a photograph and a video on an Apple iPhone of what appeared to be a Sig Sauer brand firearm. According to the UC, in the video, the source of supply for the "Sig" stated he wanted 9 [$900] for it.

30. During the transaction, the UC handed PEREZ-FLORES approximately $2,600 in prerecorded ATF funds in exchange for the two firearms.

31. According to the audio/video recording and law enforcement surveillance, at approximately 2:35 p.m., PEREZ-FLORES exited the undercover vehicle and walked into the front of the building containing the **Subject Premises**.

32. Law enforcement later determined the firearms given to the UC by PEREZ-FLORES to be a) a HS Produkt model XDM 9mm caliber pistol bearing serial number HM908582; and b) a MAC type 9mm pistol with no identifying markings.

**E. April 25, 2022 Transaction of Two Firearms, Including a Firearm with an Obliterated Serial Number**

33. On or about April 24, 2022, the UC and PEREZ-FLORES, who was using the **Subject Phone**, exchanged text messages and phone calls to arrange for the purchase of two firearms for the following day.

34. On or about April 25, 2022, at approximately 2:05 p.m., the UC, equipped with an audio/video recording device and driving the undercover vehicle,

arrived in the alleyway behind the **Subject Premises**.

35.     At approximately 2:07 p.m., according to law enforcement surveillance, PEREZ-FLORES exited the front of building containing the **Subject Premises** and walked towards the undercover vehicle along the east side of the **Subject Premises**. According to the UC, PEREZ-FLORES entered the front passenger seat of the undercover vehicle holding a plastic bag. According to the UC and the audio/video recording, once inside the vehicle, PEREZ-FLORES handed the bag to the UC. The UC removed a Sig Sauer pistol from the bag and asked PEREZ-FLORES about ammunition for the pistol. According to the UC and the audio/video recording, PEREZ-FLORES stated that the pistol already contained eleven rounds.

36.     According to the UC and the audio/video recording, the UC examined the Sig Sauer pistol and observed that the serial number had been obliterated. According to the audio/video recording, the UC stated, "Oh shit, that what's up. I didn't even notice. It already has the numbers taken off?" PEREZ-FLORES replied, "Shit, I didn't even notice that." The UC then showed PEREZ-FLORES where the serial number had been obliterated on the frame of the pistol. PEREZ-FLORES stated, "Ah, yea they do." PEREZ-FLORES asked if the serial number was listed on the barrel of the pistol. The UC told PEREZ-FLORES it was not on the barrel.

37.     According to the UC, during the transaction, the UC removed another firearm, a Smith & Wesson pistol, from the bag. According to the UC and the audio/video recording, the UC examined the Smith & Wesson pistol and commented that it looked a little "beat up." PEREZ-FLORES agreed and stated that he had oiled

it up. PEREZ-FLORES also stated, "When I get these bitches [firearms] in bro, I make sure like like they don't jam. I try and oil them up."

38.     During the transaction, the UC handed PEREZ-FLORES approximately $2,000 in prerecorded ATF funds in exchange for the two firearms.

39.     At approximately 2:14 p.m., according to the UC and law enforcement surveillance, PEREZ-FLORES exited the undercover vehicle with the plastic bag and walked into the front of the building containing the **Subject Premises**.

40.     Law enforcement later determined the firearms given to the UC by PEREZ-FLORES to be a) a Sig Sauer model P365 9mm caliber pistol with an obliterated serial number and a magazine containing eleven rounds of assorted 9mm caliber ammunition; and b) a Smith & Wesson model SD9VE 9mm caliber pistol bearing serial number FXN9258 with a magazine containing 10 rounds of ammunition.

41.     According to a National Crime Information Center query of the Smith & Wesson pistol bearing serial number FXN9258, on or about January 26, 2017, the Smith and Wesson pistol was reported stolen to the Union County Sheriff's Office in Maynardville, Tennessee.

**F.      May 4, 2022 Transaction of One Firearm**

42.     On or about May 3, 2022, the UC and PEREZ-FLORES, who was using the **Subject Phone**, communicated through recorded text messages and phone calls. During these communications, the UC and PEREZ-FLORES arranged for the purchase of one firearm for $1,500 for the following day.

43.     On or about May 4, 2022, at approximately 2:05 p.m., the UC, equipped

with an audio/video recording device and driving the undercover vehicle, arrived in the alleyway behind the **Subject Premises**.

44.     At approximately 2:04 p.m. law enforcement surveillance and the UC observed PEREZ-FLORES walking from the front of the building containing the **Subject Premises** towards the undercover vehicle. According to the UC, PEREZ-FLORES then entered the front passenger seat of the undercover vehicle with a black backpack.

45.     According to the UC, and as confirmed by the audio/video recording, upon entering the undercover vehicle, PEREZ-FLORES showed the UC messages he had exchanged with one of his sources of supply on an Apple iPhone to demonstrate to the UC that his source was charging high prices for firearms. According to the UC and the audio/video recording, PEREZ-FLORES then pulled an AR-type firearm out of the black backpack. PEREZ-FLORES explained what pieces were missing from the firearm. According to the UC and the audio/video recording, PEREZ-FLORES chambered a round and then ejected the round from the firearm by pulling the charging handle, which chambered another round, to show the UC that the firearm still functioned. PEREZ-FLORES then cleared the firearm by removing the magazine and ejecting the round from the chamber.

46.     According to the UC and the audio/video recording, PEREZ-FLORES told the UC not to use the firearm to shoot anyone. The UC told PEREZ-FLORES the UC was going to "flip it," meaning resell it for a profit. PEREZ-FLORES then stated, "I'm taking this shit [firearms] from people that would use it. I take it from them and

then I sell it to someone that won't use it. . . Because cause the people that be using it, they be like, 'Give me a stack [$1000].' . . . they'll be like 'give me a stack' and I'll be like 'alright cool' and then I'll resell it for like 1100 [$1100], 1200 [$1200]." The UC noted that PEREZ-FLORES could be selling firearms that were "hot," meaning had been used to commit a crime. PEREZ-FLORES replied, "To be honest, I don't know. Possibly, it could be."

47.     Based on my training and experience, the UC's training and experience, and the content and context of the conversation, I understood PEREZ-FLORES to state that he obtained firearms from individuals who would use the firearms violently and would sell them at a profit to others, who he hoped would not use them violently. PEREZ-FLORES also acknowledged that because he was purchasing firearms from individuals who had used the firearms, the firearms could be traced to crimes.

48.     According to the UC and the audio/video recording, PEREZ-FLORES then handed the UC the AR-type firearm. PEREZ-FLORES stated that he wished he would have obtained his "gun card," because he loves guns. According to the UC and the audio/video recording, PEREZ-FLORES put the loaded magazine for the firearm in the cup holder and stated it had "batteries," meaning ammunition.

49.     During the transaction, the UC handed PEREZ-FLORES approximately $1,500 in prerecorded ATF funds in exchange for the firearm.

50.     According to the UC and the audio/video recording, at approximately 2:35 p.m., PEREZ-FLORES exited the undercover vehicle with the black backpack and walked into the front entrance of the building containing the **Subject Premises**.

51. Law enforcement later determined the firearm given to the UC by PEREZ-FLORES to be an American Tactical Imports Omni Hybrid Maxx 5.56 caliber pistol bearing serial number NS079336.

**G.    May 13, 2022 Transaction of Two Firearms**

52. On or about May 12, 2022, PEREZ-FLORES, using the **Subject Phone**, communicated with the UC via recorded text messages and phone calls to arrange a firearms transaction for the following day During these communications, PEREZ-FLORES, using the **Subject Phone**, agreed to sell the UC two firearms for $2,200 on the following day.

53. On or about May 13, 2022, at approximately 12.37 p.m., the UC, who was equipped with an audio/video recording device, drove an undercover vehicle to the area of **Subject Premises** and parked behind the residence. Shortly thereafter, according to law enforcement surveillance and the UC, PEREZ-FLORES entered the undercover vehicle with a black backpack and a black plastic bag. According to the UC and the audio/video recording, once inside the vehicle, PEREZ-FLORES removed a pistol and firearm magazines from the plastic bag. PEREZ-FLORES then removed the magazine from the pistol and attempted to eject the round of ammunition contained within the chamber of the pistol but was unsuccessful.

54. According to the UC and the audio/video recording, PEREZ-FLORES then removed a Glock pistol from the backpack. According to the UC and the audio/video recording, PEREZ-FLORES referred to it as his "baby" and stated he did not want to get rid of it. PEREZ-FLORES then handed the Glock pistol to the UC. The UC asked PEREZ-FLORES how long he had had the Glock pistol. PEREZ-

FLORES replied that he had had it for a week. According to the UC and the audio/video recording, during the transaction, the UC asked PEREZ-FLORES about a third firearm that the two had discussed. PEREZ-FLORES replied that his source of supply for that firearm did not reply. According to the UC, PEREZ-FLORES showed the UC messages that were exchanged between him and that source on an Apple iPhone.

55.     During the transaction, the UC gave PEREZ-FLORES approximately $2,200 in prerecorded ATF funds. According to law enforcement surveillance, at approximately 12:48 p.m., PEREZ-FLORES exited the undercover vehicle and walked into the front of the building containing the **Subject Premises**.

56.     Law enforcement later determined the firearms given to the UC by PEREZ-FLORES to be a) a Glock 30 GEN4 .45 caliber pistol bearing serial number BNTK415 with an extended magazine containing twelve rounds of ammunition; and b) a Taurus G2C 9mm caliber pistol bearing serial number ACA456314 and associated ammunition.

### H.     PEREZ-FLORES is a Convicted Felon.

57.     Based on my review of PEREZ-FLORES's criminal history, I know that on or about November 3, 2021, PEREZ-FLORES was convicted of aggravated unlawful use of a weapon in the Circuit Court of Cook County, Illinois, and sentenced to one year imprisonment, with a credit for 681 days served in custody. PEREZ-FLORES is currently on parole for this conviction.

## I.    The Firearms PEREZ-FLORES Unlawfully Possessed Traveled in Interstate or Foreign Commerce.

58.    On or about May 6, 2022, an ATF Special Agent who is a certified interstate nexus expert for firearms and ammunition, examined the following firearms and determined that they were all manufactured outside of the state of Illinois:

a.    Glock 22, .40 caliber, semi-automatic pistol bearing serial number BUSD672, purchased from PEREZ-FLORES on or about February 23, 2022;

b.    Glock 19X, 9X19 millimeter, semi-automatic pistol bearing serial number BUYZ443, purchased from PEREZ-FLORES on or about April 1, 2022;

c.    HS Produkt XD40, .40 caliber, semi-automatic pistol bearing serial number XD388405, purchased from PEREZ-FLORES on or about April 4, 2022;

d.    Glock 19 Gen 4, 9X19 millimeter, semi-automatic pistol bearing serial number BKHZ515, purchased from PEREZ-FLORES on or about April 13, 2022;

e.    Taurus GX4, 9X19 millimeter, semi-automatic pistol bearing serial number IGA15768, purchased from PEREZ-FLORES on or about April 13, 2022;

f.    HS Produkt XDM, 9X19 millimeter, semi-automatic pistol bearing serial number HM908582, purchased from PEREZ-FLORES on or about April 14, 2022;

g.    Sig Sauer P365, 9X19 millimeter, semi-automatic pistol with an obliterated serial number, purchased from PEREZ-FLORES on or about April 25,

2022; and

       h.     Smith and Wesson SD9VE, 9X19 millimeter, semi-automatic pistol bearing serial number FXN9258, purchased from PEREZ-FLORES on or about April 25, 2022.

      59.     Based on his training and experience and the research he conducted, the certified interstate nexus expert determined that all of the firearms listed above were manufactured outside of the state of Illinois. The two HS Produkt firearms were both manufactured in the country of Croatia.

      60.     Therefore, in order for the foregoing firearms to have been recovered in Illinois, they moved in interstate or foreign commerce.

### J.    PEREZ-FLORES Does Not Possess a Valid Federal Firearms License to Sell Firearms

      61.     Based on my training and experience, I know that federal law requires that a firearms dealer engaged in the business of dealing in firearms be licensed by ATF. According to information received from the ATF Federal Firearms Licensing Center. ANTHONY PEREZ-FLORES does not possess a valid Federal Firearms License (FFL). Additionally, according to law enforcement databases, ANTHONY PEREZ-FLORES does not possess a valid Illinois Firearms Owners Identification (FOID) card or Concealed Carry License (CCL).

## II.    FACTS SUPPORTING PROBABLE CAUSE TO BELIEVE EVIDENCE, INSTRUMENTALITIES, AND FRUITS WILL BE FOUND IN THE SUBJECT PREMISES AND THE SUBJECT PHONE

      62.     During the investigation, law enforcement identified the **Subject Premises** as a premises used by ANTHONY PEREZ-FLORES in furtherance of his

unlawful possession and dealing of firearms. Law enforcement, based on its investigation, believes that there are two units at 7754 West Belmont Avenue, Chicago, Illinois 60634: a first-floor residential unit, and a second residential unit on the second floor, being the **Subject Premises**. As described above, law enforcement surveillance has observed PEREZ-FLORES exiting the front of the building containing the **Subject Premises** before the firearms transactions and then returning to the building through the front door at the conclusion of each transaction. Additionally, law enforcement surveillance observed PEREZ-FLORES looking out of the top floor front window, which contains the **Subject Premises**, during the transaction that occurred on or about February 18, 2022.

63.    Further, according to records obtained from the Cook County Sheriff's Office, the **Subject Premises** is PEREZ-FLORES's current parole address. According to those records, PEREZ-FLORES was previously on electronic monitoring through the Cook County Sheriff's Office at the **Subject Premises**. According to a representative of the Cook County Sheriff's Office, law enforcement officers from the Cook County Sheriff's Office visited PEREZ-FLORES at the **Subject Premises** while PEREZ-FLORES was on electronic monitoring for a case pending in the Circuit Court of Cook County. According to the representative, officers observed that the building containing the **Subject Premises** has an internal staircase at the front of the building. The first-floor unit has an entry door immediately upon entering the building. The **Subject Premises** has an entry door that is located at the top of the internal staircase.

64.     Based on my training and experience, the training and experience of other law-enforcement members with whom I have consulted, and my experience in this investigation, I believe PEREZ-FLORES stores guns and ammunition at the **Subject Premises** before he sells them to others. Further, because law enforcement surveillance observed PEREZ-FLORES walk back towards the **Subject Premises** after each transaction, I believe PEREZ-FLORES likely stores proceeds obtained from the firearm transactions in the **Subject Premises**. As such, I believe PEREZ-FLORES stores evidence, instrumentalities, fruits, and contraband related to possessing and distributing firearms within the **Subject Premises**.

65.     With respect to the **Subject Phone**, as described above, PEREZ-FLORES used the **Subject Phone** to coordinate firearms transactions with the UC. Further, during certain firearms transactions with the UC, specifically the February 23, 2022 transaction and the February 24, 2022 transaction, PEREZ-FLORES used an Apple iPhone to place telephone calls to third parties in the presence of the UC, during which PEREZ-FLORES discussed various firearms and their prices. According to toll records obtained from T-Mobile, Inc., law enforcement confirmed that PEREZ-FLORES placed calls using the **Subject Phone** at approximately the same time as those calls were made in the presence of the UC.

66.     In addition, as described above, PEREZ-FLORES used an Apple iPhone to show the UC text messages and videos that PEREZ-FLORES had about the firearms. According to open-source information, the IMEI associated with the **Subject Phone** is associated with an Apple iPhone. Accordingly, law enforcement

believes the **Subject Phone** is an Apple iPhone, and is the same phone that PEREZ-FLORES used to show the UC messages with his firearms suppliers.

67.     Based on my training and experience, the training and experience of other law-enforcement members with whom I have consulted, and my experience in this investigation, I believe PEREZ-FLORES utilizes the **Subject Phone** to communicate with individuals regarding the sale of firearms. I believe that the **Subject Phone** will contain evidence of suppliers of firearms that supply PEREZ-FLORES with firearms, while also assisting law enforcement in identifying any currently unknown co-conspirators.

68.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use,

and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

69.     Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

70.     Based on my training and experience, and the training and experience of other law enforcement officers, I know that individuals involved in criminal offenses often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones.

71.     As such, I believe the **Subject Phone** will contain the evidence and instrumentalities of PEREZ-FLORES's unlawful possession and distribution of

firearms.

## III. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

72.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.     Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed

to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

73.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

74.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.     PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

75.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information described in Attachment A-2 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

76.     The review of electronically stored information and electronic storage media described in Attachment A-2 may include the following techniques (the

following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B-2;

    b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B-2 (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B-2;

    d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B-2.

## V.  BIOMETRIC ACCESS TO DEVICES

77.    This warrant permits law enforcement agents to obtain from the person of PEREZ-FLORES the compelled display of any physical biometric characteristics

(such as fingerprint/thumbprint or facial characteristics) necessary to unlock the **Subject Phone**. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices such as the **Subject Phone** offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

61. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

62. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Apple devices and is called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The

device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Android's "Trusted Face") have different names but operate similarly to Face ID.

63.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  During the registration for these features, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.

64.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

65.     The passcode or password that would unlock the **Subject Phone** subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data

contained within the **Subject Phone**, making the use of biometric features necessary to the execution of the search authorized by this warrant.

66. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

67. Due to the foregoing, if the **Subject Phone** may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from PEREZ-FLORES the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the **Subject Phone**, including to (1) press or swipe the fingers (including thumbs) of PEREZ-FLORES to the fingerprint scanner of the **Subject Phone**; (2) hold the **Subject Phone** in front of the face of PEREZ-FLORES to activate the facial recognition feature; and/or (3) hold the **Subject Phone** in front of the face of PEREZ-FLORES to activate the iris recognition feature, for the purpose of attempting to

unlock the **Subject Phone** in order to search the contents as authorized by this warrant.

68.     The proposed warrant does not authorize law enforcement to require that PEREZ-FLORES state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the **Subject Phone**. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel PEREZ-FLORES to state or otherwise provide that information.  However, the voluntary disclosure of such information by PEREZ-FLORES would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask PEREZ-FLORES for the password to the **Subject Phone**, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the **Subject Phone**, the agents will not state or otherwise imply that the warrant requires PEREZ-FLORES to state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the **Subject Phone**, and will make clear that providing any such information is voluntary and that PEREZ-FLORES is free to refuse the request.

## CONCLUSION

78.     For all the reasons described above, I respectfully submit that there is probable cause to believe that ANTHONY PEREZ-FLORES has committed the

offense of willfully engaging in the business of dealing in firearms without a license and unlawful possession of a firearm by a felon, in violation of Title 18, United States Code, Sections 922(a)(1)(A) and 922(g)(1).

79.     Further, based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachments B, will be found in the **Subject Premises**, more particularly described in Attachment A-1, and the **Subject Phone**, more particularly described in Attachment A-2, authorizing the seizure of the items described in Attachments B, pursuant to the protocol described in the addendums to Attachments B.

FURTHER AFFIANT SAYETH NOT.

_____
Thomas Sheehan
Special Agent, Bureau of Alcohol, Tobacco,
Firearms & Explosives

Sworn to and affirmed by telephone the 15th day of June, 2022

_____
YOUNG B. KIM
United States Magistrate Judge